[Civ. No. 17263. First Dist., Div. Two. Mar. 24, 1958.]

ROSEMARY SCARANO, a Minor, etc., Appellant, v.
THOMAS SCHNOOR, Respondent.

614

Charles P. Scully and Jack H. Werchick for Appellant.

Joseph F. Rankin, Peart, Baraty & Hassard and Salvatore Bossio for Respondent.

DOOLING, J.—Plaintiff Rosemary Scarano, through her guardian ad litem, appeals from a judgment for defendant Dr. Thomas Schnoor.

In September 1950 appellant was having visual difficulties and was referred to defendant by Dr. Peters, an optometrist. Defendant, an opthalmologist, diagnosed the difficulty as "a questionably displaced lens with nasal pigments" (lens improperly centered behind the pupil with pigment on the nasal side of the lens).

Appellant's mother testified that defendant recommended surgery on both eyes for a fee of $1,000 and when it was determined that the parents could not afford this amount, he sent appellant to the University of California Hospital. Defendant testified that he informed Mrs. Scarano that surgery might be advisable and that it would be an expensive procedure. He denied quoting any fee and stated that he sent appellant to the University of California Hospital for a thorough check or "work-up."

Defendant testified that he received a verbal report from Dr. Hogan of the University of California Hospital stating that surgery was advisable. A letter from a member of the hospital staff dated November 9, 1950, received by defendant diagnosed appellant's condition as bilateral subluxated lenses of congenital origin (displaced lenses in both eyes). The letter further stated:

"It was our feeling that this patient should be handled conservatively since her eyes are quiet and in fairly good condition . . . In the future, she has about a fifty percent chance of having either iritis or glaucoma. If either of these complications should arise, surgical intervention would be indicated. Meanwhile, watchful waiting might be the best plan."

Defendant next saw appellant in July, 1953. His diagnosis was that appellant had a congenital bilateral displacement condition with cataractous changes (opacity of the lenses). Defendant testified that the latter condition was not present at the first examination in 1950. He did not consult with any other opthalmologist and recommended surgery as the only method of correcting appellant's vision.

Although appellant's parents testified that defendant had assured them that the operation would not result in any poorer vision he denied this. Surgery was advised at this time because the child was 7½ years of age and since vision develops until approximately 8 years of age, to improve vision the surgery must take place before that time.

Appellant's left eye was operated upon on July 16, 1953. Of the three possible operating procedures defendant chose the intracapsular extraction. This method consists of the removal of the entire lens including the capsule (which contains the lens substance). The lens is held in place by zonular fibers and in removing the lens these fibers must be broken. Where there is a displaced lens in a child the fibers are usually stretched on one side and very strong on the opposite side. Defendant testified that while he expected this condition the zonular fibers proved tougher than he anticipated. He was unable to break these strong fibers by pulling or twisting the lens and had to use a loop. This instrument is placed under the lens to give greater traction.

On August 15, 1953, appellant's vision in her left eye was 20/40 to 20/50 which was an improvement from that prior to surgery. Due to a "hammocking" of the pupil (the iris drawing up and closing the pupil) a visual iridectomy was per-

formed by defendant on October 8, 1953. This operation consists of cutting a hole in the iris to permit vision.

Appellant's vision did not improve and she was taken to Dr. Pischel. Dr. Pischel found marked inflammation in the eye with poor light perception. He also found early signs of phthisis bulbi or shrinkage of the eyeball. These conditions were due to a loss of the vitreous substance of the eye and it was finally decided that the eye would not improve and it was removed and a prosthesis installed.

Appellant's action was based on alleged negligent diagnosis and treatment. She attempted to prove that surgery should not have been performed and that the operative procedure used was wrong, in that the defendant should have expected such procedure would cause a vitreous loss.

Expert witnesses for defendant agreed that for a patient with a dislocated lens plus early cataract formations the optimum time for surgery would be between 6½ and 7 years of age. There was testimony that as to the diagnosis and the operative procedure the defendant exercised a "lot better than average care." The intracapsular procedure was stated to be a standard technique in the community and the practice of being assisted by a trained nurse rather than an opthalmological surgeon was stated to be standard in the community. Defendant had previously performed two or three intracapsular procedures on children. Dr. Pischel testified that he would not do an intracapsular procedure in the case of a child with a displaced lens and all the zonular fibers attached.

Appellant relies on the following grounds for reversal:

1. The trial court gave erroneous instructions.

2. The trial court refused necessary and proper instructions offered by plaintiff.

3. The trial court abused its discretion in restricting the cross-examination and examination of medical witnesses by plaintiff.

■ The court instructed the jury:

"In order for plaintiff to recover, it is not necessary that she prove that the negligence of the defendant was the sole proximate cause of the injuries received by her, for liability for injuries may be imposed upon a defendant where his negligence is one of several contributing factors, each of which is a proximate cause of the injuries.

"But where there are two or more possible causes of an injury for one of which the defendant is not responsible, the plaintiff, in order to recover, must show by competent evidence

that the injury was wholly or partly the result of that cause which would render the defendant liable. If the evidence in the case leaves it just as probable that the injury was the result of one cause as much as the other, the plaintiff cannot recover."

Appellant argues that the last sentence of this instruction would be understood by the jury to mean that if they found that the injury proximately resulted from both causes, one of which would render the defendant liable, they must nevertheless find for the defendant. Reading the instruction as a whole it is not reasonably subject to this construction. The jury was plainly told that the negligence of the defendant need not be the sole proximate cause and that the defendant is liable "where his negligence is *one of several* contributing factors, each of which is a proximate cause." They were then told that to recover plaintiff must prove "that the injury was wholly or *partly* the result of that cause which would render the defendant liable." In the face of these clear statements of the law they cannot have understood the last sentence in the sense for which appellant contends. They had previously received the standard instruction that when the evidence "is so equally balanced in weight and quality, effect and value, that the scales of proof hang even, your verdict should be against the party" having the burden of proof. In the light of the whole instruction they can only have understood the last sentence to have reference to a particular application of this general rule on the burden of proof, which was the evident purpose of the court in giving it.

Appellant criticizes the use of the word "competent" to qualify "evidence" in this instruction. While technically this may be error (*McNamara* v. *Emmons,* 36 Cal.App.2d 199, 206 [97 P.2d 503]), the jury cannot have been misled by it. They were given the usual instructions on their powers and duties in weighing the evidence and we cannot suppose that they disregarded them or would undertake to determine the "competency" of the evidence which the court had permitted to be introduced for their consideration.

Appellant complains of an instruction which told the jury that the action was one predicated on a claim of "want of skill or negligence" and that in order to recover plaintiff must prove that defendant acted in a manner "that physicians and surgeons of ordinary skill, care and diligence, engaged in the same kind of work or specialty" would not have done.

It is correct, as appellant points out, that the true test is not "ordinary care and skill" but "that degree of learning and skill ordinarily possessed by physicians and surgeons in the locality" (*Sansom* v. *Ross-Loos Medical Group,* 57 Cal.App. 2d 549, 552 [134 P.2d 927]), and to determine this standard "we are not permitted to aggregate into a common class the quacks, the young men who have no practice, the old ones who have dropped out of the practice, the good, and the very best, and then strike an average between them. This method would evidently place the standard too low." (*Sim* v. *Weeks,* 7 Cal. App.2d 28, 42 [45 P.2d 350].)

However the instructions must be read as a whole. The jury had just previously been instructed that defendant must "exercise reasonable and ordinary care in applying that degree of learning and skill ordinarily possessed by doctors of good standing in the same or similar locality"; that it is his duty to possess "that degree of learning and skill ordinarily possessed by physicians and surgeons of good standing, practicing in the same locality"; that if he undertakes service in a special branch of medicine or surgery, "and if at that time and in the same locality . . . there are members of his profession who specialize in . . . that particular branch of the healing profession, it is his duty to possess that degree of learning and skill ordinarily possessed by physicians and surgeons of good standing who engaged in that special practice in the same locality"; that he must possess "that reasonable degree of professional learning and skill generally possessed by physicians and surgeons in the vicinity in which he practices, in like situation" and "exercise reasonable and ordinary care and skill in the application of such knowledge, to accomplish the purpose for which he is employed"; and that " [i]f a physician and surgeon undertakes the treatment of a case which comes within the field of specialists practicing in the same locality" and if he "does not possess the special ability required by the case in question" and there are specialists in the locality possessing such special ability, it is his duty "to inform the patient of his lack of skill and knowledge" and "if the condition requires, to refer the patient to a specialist." The instructions summarized immediately preceded the instruction complained of. Taking the instructions together the jury must have understood the particular instruction to be qualified by those which preceded it and cannot have been misled into applying a lower standard of conduct than the previous instructions had repeatedly specified.

The court gave BAJI instruction 214-A, California Jury Instructions, Civil, 4th Revised Edition, page 780.

■ "Where there is more than one recognized method of . . . treatment, and no one of them is used exclusively and uniformly by all practitioners of good standing, it is not negligence for a physician and surgeon if, in exercising his best judgment, he selects one of the approved methods, which later turns out to be a wrong selection, or one not favored by certain other practitioners."

Appellant complains that the instruction was nowhere limited to the community in which defendant was practicing and that it "provides the defendant with an opportunity to escape liability merely by conforming to some recognized method used by practitioners *somewhere* in good standing and approved by *someone.*"

The instruction must be read with the other instructions and the jury was repeatedly instructed that the standard to be applied was the standard measured by the practice of doctors in good standing in the same community and in a case of this nature by specialists practicing in the same community. Under the circumstances the jury must have understood these qualifications to apply to this instruction.

■ The jury was given BAJI instruction No. 214-B, California Jury Instructions, Civil, 4th Revised Edition, pages 783-784. In the first sentence of this instruction the jury was told:

"In determining whether defendant Thomas Schnoor's learning, skill and conduct *fulfill* the duties imposed on him by law, as they have been stated to you, you are not permitted to set up arbitrarily a standard of your own." (Emphasis ours.) Appellant complains that the use of the verb "fulfill" in the present instead of the past tense set up a standard as of the time of the trial instead of the time of the operation. We cannot believe that the jury could have so construed it in view of the fact that the entire trial was directed to the question of defendant's conduct in performing the operation and in his antecedent diagnosis.

■ By this instruction the jury was further told that "the only way you may properly learn that standard is through evidence presented in this trial by physicians and surgeons called as expert witnesses." Appellant contends that the instruction was in error because "it eliminates proof . . . of the standard of care in the community through resort to med-

ical recommendation and medical books." It is obvious that medical books cannot fix the standard of practice for a particular community—the standard of practice in the community may be higher or lower or differ otherwise from the textwriter's recommended practices. The use of medical texts is proper in cross-examination of the medical witnesses who have relied upon them but they are not admissible on direct examination. (*Gluckstein* v. *Lipsett*, 93 Cal.App.2d 391, 400-404 [209 P.2d 98].) If their use on cross-examination results in the medical witness modifying his testimony as to the standards in the community it is still the witness' testimony, not the medical text, which is to be looked to to determine the standard in the particular community.

▮ The court instructed that the testimony of lay witnesses "cannot be considered by you upon any question relating to the skill and care, or want of it, possessed and exercised by the defendant"; but "When it is a matter of common knowledge that danger is involved in certain conditions, or in a failure to maintain certain conditions, or to take certain precautionary measures, expert testimony is not required to establish such a fact, but it may judicially be noticed as a part of that fund of common knowledge shared by us with our fellow citizens generally."

The instruction as so qualified cannot have misled the jury. The first part of the instruction, in identical language, was approved in *Friedman* v. *Dresel*, 139 Cal.App.2d 333, 341 [293 P.2d 488], as a correct statement of "the general rule that ordinarily the standard of care of a doctor . . . can be established only by the testimony of experts in the field." However the court then held that this should have been qualified by giving, as was here done, an instruction that where "negligence on the part of a doctor is demonstrated by facts which can be evaluated by resort to common knowledge, expert testimony is not required . . ." The instruction as a whole was proper.

▮ Appellant complains of the giving of an instruction on expert testimony that while opinions of witnesses are not ordinarily permitted to be given, the law recognizes an exception in the case of expert witnesses. "A person who by education, study and experience has become an expert in any art, science or profession . . . may give his opinion as to any such matter in which he is versed and which is material to the case."

In connection with the quoted sentence appellant also complains of the refusal to give an instruction offered by her: "In a malpractice case, a plaintiff can establish her case by the testimony of the defendant physician and surgeon himself, if his testimony established negligence on his part." This proposed instruction correctly states the law. (*Lashley* v. *Koerber*, 26 Cal.2d 83, 89 [156 P.2d 441].) However the jury was instructed generally that in determining whether negligence was proved they should consider all the evidence regardless of who produced it. "A party is entitled to the same benefit from evidence that favors her cause or defense when produced by her adversary as when produced by herself."

The jury must have understood this instruction to include defendant's own testimony. Appellant argues however that the failure to give her proposed instruction coupled with the instructions that opinion evidence could only be given by, and the standard of practice in community established by, expert witnesses would lead the jury to believe that they could not look to defendant's testimony elicited under cross-examination (Code Civ. Proc. § 2055) for those purposes, since he was not qualified as an expert. An examination of the transcript shows that he was qualified by counsel for appellant as an expert at the beginning of his cross-examination. After establishing that for a number of years defendant had specialized in practice on the eyes, ears, nose and throat and particularly in opthalmology, including eye-surgery, counsel for appellant asked the following questions of defendant and received the following answers:

"Q. . . . In 1950, from 1950 on through 1953, during the time that you saw Rosemary Scarano and during the time that you had her as a patient, you were familiar with the standard of care of opthalmologists in your community and in similar communities? A. I was.

"Q. And were you familiar with the usual training and learning and education possessed by opthalmologists generally in your community and similar communities? A. Yes.

"Q. Now I am going to ask you some questions, and will you please keep in mind that when I ask you questions about what an eye man or doctor would do . . . or what learning or knowledge he should have, that I am referring to . . . those standards of care in the community in which you say you are familiar. Will you keep that in mind, sir? A. Surely.

"Q. So I won't have to say 'on the basis of the standard of care in the community,' do you understand that? A. Yes."

The jury must have known from this that defendant was being qualified and examined as an expert, and when they were instructed that ordinarily the standard of care in the community must be proved "by physicians and surgeons called as expert witnesses" we cannot suppose that they would ignore the testimony of defendant on that subject in view of the other instruction that a "party is entitled to the same benefit from evidence that favors her cause . . . when produced by her adversary as when produced by herself."

Appellant further complains of the failure to give two requested instructions on the standard of care in malpractice cases but the jury was fully and correctly instructed on that subject and where the jury is so instructed a party cannot complain of the failure to instruct in particular language.

The court properly sustained objections to a question of defendant as to whether he would perform the same surgery on the other eye "on the basis of what you knew immediately after the operation" and questions of similar tenor. The circumstances to be considered in deciding defendant's negligence "are those which the evidence shows may reasonably be supposed to have been known to such person and to have influenced his mind and actions at the time." (*Scott* v. *San Bernardino Valley Traction Co.*, 152 Cal. 604, 607 [93 P. 677].) Negligence is not to be determined by hindsight nor by what a party subsequently learns. These rulings were therefore correct.

Appellant asked a medical witness for defendant: "Doctor, in a case of vision of 20/50 or 20/60, would you recommend surgery on a subluxated lens or a near-sighted condition just because of the vision alone and no other reason?" An objection was sustained on the ground that the question was compound. It clearly was. Counsel for appellant said that he would reframe the question, but instead went on to another subject.

The case was fairly tried and we find nothing in the record to justify a reversal.

Judgment affirmed.

Kaufman, P. J., and Draper, J., concurred.