

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-24-1995

# Douglas v Owens

Precedential or Non-Precedential:

Docket 94-7406

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

## Recommended Citation

"Douglas v Owens" (1995). *1995 Decisions.* Paper 82.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/82

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 94-7406


ANDRE DOUGLAS

v.

DAVID S. OWENS; ROBERT M. FREEMAN; RICHARD C. SMITH;
LT. DEITRICH; LT. ORWIG; GRIFFITH; HORNING; SIMONCINI;
ARDABELL; BERA; ENRIQUEZ; KIM WILSON; SOWELL; C.O. POWELL;
C.O. SMITH; LT. SPELLS; JOHN DOES

Ronald Griffith; Christopher Simoncini;
Jose Luis Enriquez; Carl Ardabell,
Appellants


Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 89-cv-01879)


Argued January 12, 1995

BEFORE:  COWEN, NYGAARD and ALITO,
Circuit Judges

(Filed March 24, 1995)


Eileen E. Wiggins (Argued)
Williams & Cuker
1650 Arch Street
Suite 2350
Philadelphia, PA  19103

    COUNSEL FOR APPELLEE
    Andre Douglas #AY-7089

John G. Knorr, III
Sandra W. Stoner
Gregory R. Neuhauser (Argued)
Office of the Attorney General
of Pennsylvania

Strawberry Square
15th Floor
Harrisburg, PA  17120

       COUNSEL FOR APPELLANTS
       Ronald Griffith
       Christopher Simoncini
       Carl Ardabell
       Jose Luis Enriquez


                    OPINION



COWEN, Circuit Judge.

        This civil rights action was filed with the United

States District Court for the Middle District of Pennsylvania

pursuant to 42 U.S.C. § 1983 by a state prisoner who alleges that

he was beaten by numerous prison guards in the aftermath of a

prison riot.  The prison guards appeal the jury verdict and entry

of judgment in favor of the plaintiff.  We are called on to

determine whether the district court: (1) abused its discretion

in limiting the scope of cross-examination of a witness for the

plaintiff; (2) abused its discretion in instructing the jury on

the law governing the use of force against prisoners; and (3)

erred by permitting the jury to render a special verdict on an

issue which had not originally been submitted to them.

        Because we conclude that the district court abused its

discretion by improperly limiting the scope of cross-examination

of a key witness for the plaintiff, we will reverse the judgment

of the district court and remand for a new trial.  In light of

our decision to remand for a new trial, it is not necessary to

address the issue of the jury instruction regarding the law governing the use of force against prisoners. Nonetheless, because of the likelihood that this issue will undoubtedly arise again during the new trial, we will give directions on the issue to the district court. Finally, as to the special verdict issue, we conclude that the district court erred in allowing the jury to consider whether a prison guard approved an excessive use of force when the only theory of liability submitted to the jury was that the prison guard actually participated in the beating.

## I. Factual and Procedural Background

Defendants in the district court and appellants before us are four prison guards from the State Correctional Institution at Camp Hill, Pennsylvania ("SCI-Camp Hill").[1] Andre Douglas ("Douglas"), plaintiff in the district court, was an inmate at the same institution and alleges that he was beaten on two separate occasions by prison guards in the immediate aftermath of riots which occurred in October of 1989 at SCI-Camp Hill.

Douglas filed two complaints which alleged that appellants and seven others, all prison guards or prison officials, violated his constitutional rights when they beat him, observed others beat him, and failed to protect him. Summary

---

[1]. The four defendants/appellants are Ronald Griffith ("Griffith"), Christopher Simoncini ("Simoncini"), Jose Luis Enriquez ("Enriquez"), and Carl Ardabell("Ardabell"). For purposes of this appeal we will refer to them collectively as "appellants" or "prison guards" unless it is necessary to distinguish among them.

judgment was granted in favor of two defendants.  The case against the remaining defendants, including appellants, was tried before a jury.

Testimony at trial elicited that on October 25 and 26, 1989, riots broke out at SCI-Camp Hill.  Prior to and during the riots, Douglas was confined in the Restricted Housing Unit ("RHU"), also known as "D block," within the prison.  During the riots, the security of RHU had been compromised, requiring a thorough search or "shakedown" of the RHU, which was conducted on October 31, 1989.  Douglas claimed that he was twice beaten without cause by corrections officers:  once on October 31 after the shakedown and once on November 3, immediately before he was transferred to the federal penitentiary at Lewisburg, Pennsylvania.[2]  Douglas claims that during the October 31 incident, he was handcuffed and then beaten with a baton in his cell, dragged out of his cell, beaten again, and then threatened with a shotgun.

Defendants attempted to show that Douglas was never beaten by offering the following evidence:  (1) all of the defendants denied beating Douglas; (2) members of the Pennsylvania State Police who patrolled SCI-Camp Hill during the riots and were on duty during the alleged beating testified that Douglas had not been beaten; (3) although medical records at the

_____

[2].  Because none of the appellants were implicated in the alleged beating that occurred on November 3, 1989, any testimony or evidence relating to that day is not relevant for purposes of this appeal.

prison indicate that Douglas complained of and was treated for chest pain following the riots, the medical records did not note any bruises or contusions that Douglas claims were present on his chest; and (4) a videotape of Douglas taken upon his arrival at Lewisburg shows no visible injuries to his head or face. Additionally, when asked by correction officials in the videotape if he had any injuries, Douglas answered that he did not.

Douglas attempted to corroborate his claim with testimony from the Imam Quadir Sabir ("the Imam")[3], who at the time was an Islamic chaplain at SCI-Camp Hill. The Imam testified that at some point between October 25 and November 3, 1989, he observed that Douglas had "abrasions or bruises in the chest area and around the neck area." App. at 73. On cross-examination of the Imam, appellants attempted to establish that the Imam had been fired by the Department of Corrections because of his involvement with the rioting inmates at SCI-Camp Hill and his failure to cooperate in an investigation of the riots. The district court, however, refused to permit this line of questioning on cross-examination and instead only allowed the jury to learn that the Imam's employment had been "terminated."[4]

_____

[3]. An "Imam" is a prayer leader of Islam, a Moslem scholar, or an authority on Islamic law.

[4]. The cross-examination of the Imam was conducted by defense counsel Stoner as follows:

     Q.   You used to be an employe[e] of the Department of
          Corrections; isn't that correct?

     A.   Yes.

(..continued)

Q. You are no longer an employe[e] of the Department of Corrections; are you?

A. No.

Q. In fact, you were an employe[e] --

Ms. Wiggins (counsel for Douglas): Objection, Your Honor, relevance.

Ms. Stoner: It goes to bias and motive, Your Honor.

Ms. Wiggins: May we approach?

The Court: Yes.

(The following discussion was had at sidebar:)

Ms. Stoner: Your Honor, he was terminated by the Department, and therefore it goes to his bias and motive to speak against these officers. In fact, he was terminated because of his alleged involvement with the inmates in this riot, and his failure to cooperate in an investigation of the riots.

The Court: I am not going to let you get into the reasons of the termination. You can bring out the fact that he was terminated.

Ms. Stoner: That he was fired by the Department, and in fact was barred from any federal or any state –

The Court: No. He was terminated. That gives you enough of a bias. You don't have to get into the reasons for his termination. We would be trying a case within a case.

Ms. Wiggins: The ruling is that she may not say that he was fired?

The Court: That he was terminated.

Ms. Stoner: Your Honor, he was fired.

The Court: He was terminated. That is the way it is going to be.

Ms. Stoner: I would note my objection for the record.

At the conclusion of his case, Douglas voluntarily dismissed one defendant.  In addition the district court granted another defendant's motion to dismiss.  The jury returned special verdicts finding that appellants Simoncini, Enriquez, and Ardabell had used excessive force against Douglas and that appellant Griffith had approved the use of excessive force.  The jury awarded Douglas a total of $10,000 in compensatory and punitive damages.[5]

(..continued)

The Court:  You have an exception.

(End of discussion at sidebar.)

By Ms. Stoner:

Q.  Mr. Sabir, wasn't your employment with the Department of Corrections terminated by the Department after the riot?

A.  Yes.

Ms. Stoner:  I have no further questions, Your Honor.

App. at 80-82.

[5].  The damages were allocated as follows:

| DEFENDANT | COMPENSATORY | PUNITIVE | TOTAL |
|---|---|---|---|
|  |  |  |  |
| Simoncini | $ 500 | $ 1000 | $ 1500 |
| Griffith | 500 | 1000 | 1500 |
| Enriquez | 500 | 1000 | 1500 |
| Ardabell | 1500 | 4000 | 5500 |
|  |  |  |  |
| TOTAL | $ 3000 | $ 7000 | $10,000 |

App. at 305-06.

Appellants argue that the district court improperly limited their scope of cross-examination of the Imam. Next, appellants take issue with the district court's refusal to instruct the jury that not all force used against a prisoner is excessive. They argue that had the jury been informed that prison guards may lawfully use reasonable physical force when necessary in the prison setting, the jury may have concluded that such force was justified under the circumstances. Finally, appellants claim that it was improper for the district court to allow the jury to impose liability on Griffith for approving the use of excessive force, when throughout the litigation and in the charge to the jury Douglas only claimed that Griffith used excessive force.

## II. Discussion

### A. Scope of Cross-Examination

We review a district court's ruling concerning the allowable scope of cross-examination for abuse of discretion. United States v. Werme, 939 F.2d 108, 117 (3d Cir. 1991) (citing United States v. Reed, 724 F.2d 677, 679 (8th Cir. 1984)), cert. denied, 502 U.S. 1092, 112 S. Ct. 1165 (1992).

We begin our analysis by noting that a party is guaranteed "only `an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" Kentucky v. Stincer, 482 U.S. 730, 739, 107 S. Ct. 2658, 2664 (1987) (quoting Delaware v. Fensterer, 474 U.S. 15, 20, 106 S. Ct. 292, 294 (1985))

(emphasis in original). We also recognize that the district court is required to strike a balance between the opportunity to cross-examine and the need to prevent repetitive or abusive cross-examination. United States v. Casoni, 950 F.2d 893, 919 (3d Cir. 1991). Thus, the district court may properly exercise its discretion in this area by imposing reasonable limits on the scope of cross-examination, weighing such factors as undue prejudice, relevancy, and delay due to repetition. As stated recently by the Court of Appeals for the Eleventh Circuit, "[t]rial judges retain wide latitude to impose reasonable limits on cross-examination based on concerns about, among other things, confusion of the issues or interrogation that is repetitive or only marginally relevant." United States v. Baptista-Rodriguez, 17 F.3d 1354, 1370-71 (11th Cir. 1994).

To properly evaluate a witness, a jury must have sufficient information to make a discriminating appraisal of a witness's motives and bias. See United States v. Abel, 469 U.S. 45, 52, 105 S. Ct. 465, 469 (1984). It is an abuse of discretion for a district judge to cut off cross-examination if the opportunity to present this information is not afforded. See Harbor Ins. Co. v. Schnabel Foundation Co., 946 F.2d 930, 935 (D.C. Cir. 1991) (district court abused its discretion in cutting off cross-examination because it was not collateral, irrelevant, or prejudicial and had a direct bearing on the weight to be given

the witness' testimony by the jury), <u>cert.</u> <u>denied</u>, __ U.S. __, 112 S. Ct. 1996 (1992).[6]

<hr />

[6]. Much of the current authority pertaining to the permissible scope and limitation of cross-examination involves cases of a criminal nature. <u>See</u> <u>Pennsylvania v. Ritchie</u>, 480 U.S. 39, 51–52, 107 S. Ct. 989, 998 (1987) ("[T]he right to cross-examination includes the opportunity to show that a witness is biased, or that the testimony is exaggerated or unbelievable."); <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 678–79, 106 S. Ct. 1431, 1435 (1986) ("[T]he exposure of a witness' motivation in testifying is a proper and important function of . . . cross-examination."); <u>United States v. Ovalle–Marquez</u>, 36 F.3d 212, 217 (1st Cir. 1994) (trial court abuses its discretion on cross-examination "if the jury is left without sufficient information concerning formative events to make a discriminating appraisal of a witness's motives and bias") (citations and internal quotation omitted), <u>cert. denied</u>, __ U.S. __, 115 S. Ct. 947 (1995); <u>United States v. Carty</u>, 993 F.2d 1005, 1010 (1st Cir. 1993) (the district court may not limit cross-examination unless the jury possesses sufficient information to make a discriminating appraisal of the possible biases and motivations of the witness); <u>United States v. Roldan–Zapata</u>, 916 F.2d 795, 806 (2d Cir. 1990) (cross-examination is not improperly limited if the jury possesses "facts sufficient to make a discriminating appraisal of the particular witness's credibility") (citation and internal quotation omitted), <u>cert. denied</u>, 499 U.S. 940, 111 S. Ct. 1397 (1991); <u>United States v. Coleman</u>, 997 F.2d 1101, 1105 (5th Cir. 1993) (the court did not abuse its discretion in limiting cross-examination because the jury received adequate information with which to evaluate the bias, credibility, and vindictive proclivities of the witness), <u>cert. denied</u>, __ U.S. __, 114 S. Ct. 735 (1994); <u>United States v. Hall</u>, 653 F.2d 1002, 1008 (5th Cir. 1981) ("The exposure of possible motivations for false testimony is a fundamental element of cross-examination . . . . Thus, cross-examination into any motivation or incentive a witness may have for falsifying his testimony must be permitted."); <u>United States v. Christian</u>, 786 F.2d 203, 213 (6th Cir. 1986) (the district court did not abuse its discretion in limiting the scope of cross-examination because the aggressive attacks on the witness' credibility by counsel put the jury in possession of sufficient information by which to appraise the witness' credibility); <u>United States v. Nelson</u>, 39 F.3d 705, 708 (7th Cir. 1994) ("[W]hen reviewing the adequacy of cross-examination, the question is whether the jury had sufficient information to make a discriminating appraisal of the witness's motives and bias.") (citation and internal quotation omitted) (bracket in original); <u>United States v. Durman</u>, 30 F.3d 803, 811

As related above, appellants were only permitted to elicit from the Imam that he was "terminated" from his position after the riots. We conclude that the district court abused its discretion in not allowing appellants the opportunity to question the Imam with regard to the circumstances surrounding his discharge. The word "terminated" and even the word "fired" is not sufficient to effectively portray to the jury any alleged bias, lack of credibility, and motives of the Imam. The Imam could have been terminated or fired for any number of "neutral"

(..continued)
(7th Cir. 1994) (no abuse of discretion because counsel was able to cross-examine the witness extensively and had the opportunity to probe credibility and bias), cert. denied, __ U.S. __, 115 S. Ct. 921 (1995); United States v. Warren, 18 F.3d 602, 603 (8th Cir.) (trial court did not abuse its discretion in refusing to permit cross-examination on a particular topic because counsel had an opportunity to vigorously cross-examine witness about related matters), cert. denied, __ U.S. __, 115 S. Ct. 652 (1994); United States v. Dees, 34 F.3d 838, 844 (9th Cir. 1994) (because counsel was able to elicit substantial information from the witness relating to her biases, the district court did not abuse its discretion by further limiting cross-examination); United States v. Morales-Quinones, 812 F.2d 604, 614 (10th Cir. 1987) ("[C]ross-examination of a witness regarding specific instances of conduct which are probative to show any incentive a witness may have to falsify his testimony is also proper."); United States v. Diaz, 26 F.3d 1533, 1541 (11th Cir. 1994) (no abuse of discretion in limiting cross-examination because no further bias would have been exposed by further questioning), cert. denied, __ U.S. __, 115 S. Ct. 952 (1995).

While cross-examination in the criminal context assumes a heightened importance because of the constitutional implications inherent in confronting one's accuser pursuant to the Sixth Amendment, similar concerns -- the jury must have sufficient information to make a discriminating appraisal of the witness's motives and bias -- are implicated in a civil trial context as well.

reasons which would not suggest to the jury that he was biased in favor of Douglas and against appellants.[7] Without further inquiry, the jury did not have sufficient information with which to make a discriminating appraisal of the Imam's motives or bias.

In addition, the jury may have felt that a member of the clergy is impartial and tells the truth. Our concern that the jury may have given unhesitating credence to the testimony of the Imam, a religious figure, is heightened by the fact that the only claim on which the jury found in favor of Douglas was the claim in which his testimony was corroborated by the Imam.[8]

In order to effectively cross-examine the Imam, the appellants must be in a position to reveal that the Imam may be both biased against appellants and biased in favor of prisoners, such as Douglas.[9] In order to accomplish this, appellants must

---

[7]. We can speculate as to any number of reasons including: (1) a budget deficit which required that his position be eliminated; (2) a transfer to another correctional institution and a refusal on his part to move or commute there; (3) the ending of a provisional term of employment; (4) the lack of Islamic prisoners at that prison; (5) the prisoners desire to have another Imam; or (6) a host of other reasons having nothing to do with the prison riot.

[8]. Indeed, we note that where the only testimony for the plaintiff was the testimony of Douglas himself, the jury returned a verdict in favor of the appellants.

[9]. Appellants have suggested two possible methods of achieving this goal: (1) allow a limited cross-examination whereby the appellants set forth only the facts of the Imam's discharge; or (2) allow an extensive cross-examination and provide the jury with a limiting instruction which explains that the purpose of the cross-examination was simply to reveal the bias of the witness. Without intruding unnecessarily into what properly remains the domain of the district court, we note that either of these methods would be a suitable technique if, as a consequence,

at a minimum be in a position to attempt to elicit from the Imam that: (1) he exhibits some bias against appellants because he was fired from his position at the prison due to alleged misconduct on his part; and (2) he exhibits some bias in favor of prisoners like Douglas as revealed by his refusal to participate in the investigation.[10]  Because we conclude that the district court unduly limited the scope of cross-examination, we will remand this matter to the district court for a new trial.[11]

### B.  Jury Instruction on the Use of Excessive Force

We must next decide whether the district court erred in instructing the jury on the law governing the proper use of force

(..continued)
the jury receives adequate information with which to evaluate the bias and credibility of the Imam.

[10].  We intimate no view as to whether the evidence of the Imam's alleged involvement with the rioting inmates or his failure to cooperate in the investigation of the riot would be a specific instance of conduct which could not be proved by extrinsic evidence except as otherwise provided in Rule 608(b) of the Federal Rules of Evidence.

[11].  We are further troubled by the absence in the record of any evidentiary ruling by the district court whereby this highly relevant evidence was excluded.  Douglas argues that the district court implicitly performed a Rule 403 (Federal Rules of Evidence) balancing analysis and concluded that the evidence should be excluded.  However, assuming arguendo that a Rule 403 balancing was undertaken, we would be hard-pressed to hold that this extremely relevant and probative evidence of the Imam's alleged bias was "outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Fed. R. Evid. 403.  Additionally, we are unwilling to abdicate our appellate function and defer to the district court when such evidentiary rulings have not been made part of the record before us.

against prisoners. "We review a district court's rulings on points for the jury charge for abuse of discretion." Waldorf v. Shuta, 896 F.2d 723, 740 (3d Cir. 1990) (citation omitted). At trial, counsel for Douglas and counsel for appellants presented the jury with two mutually exclusive and inconsistent theories concerning the beatings which allegedly occurred. Douglas argued before the jury that he was beaten without provocation by prison guards. Appellants defended on the theory that the alleged beatings never occurred and, thus, they could not have possibly participated in such conduct. Nevertheless, appellants also requested the district court to charge the jury on the proper and reasonable use of force in a prison setting.[12]

The district court rejected the proposed jury instruction offered by appellants, and in its place used its own charge regarding the use of excessive force in a prison

_____

[12]. Specifically, appellants asked the district court for the following charge:

Not all force, push, or shove used by a prison official should be considered excessive. Prison officials may use force against inmates as a security measure to resolve a disturbance that poses significant risks to the safety of inmates and staff. The infliction of pain in the course of a prison security measure, therefore, doe[s] not amount to cruel and unusual punishment even if in retrospect it appears that the amount of force used or authorized turned out to be unnecessary in a strict sense. So, if you find that the defendants authorized use of force in a good faith effort to maintain or restore discipline, i.e., to make sure that institution was secure, then you must return a verdict in favor of the defendants.

Douglas v. Owens, No. 89-1879, slip op. at 5 (M.D.Pa. May 31, 1994).

context.[13]  Appellants argue that the charge given by the
district court is inadequate because it fails to convey the
notion that "force is not constitutionally `excessive' just
because it turns out to have been unnecessary in hindsight."
Appellants' Brief at 16 (emphasis in original).

---

[13]. The district court charged the jury as follows:

The United States Constitution protects persons from
being subjected to excessive force.  In other words, prison
officials may employ only the amount of force necessary under the
circumstances.
. . .
In considering the degree of force a reasonable prison
official will use, you may consider such factors as the need for
the application of force, the relationship between the need and
the amount of force that was used, the extent of the injury
inflicted, whether force was applied in a good faith effort to
maintain and restore discipline or maliciously or sadistically
for the very purpose of causing harm, the extent of the threat to
the safety of staff and inmates as reasonably perceived by
responsible officials [and] any efforts made to temper the
severity of a forceful response.
In order to prevail on his claim, plaintiff must prove
by a preponderance of the evidence that the defendants were
actually in his cellblock, and that they used physical force
against him, and that the force was applied maliciously and
sadistically for the very purpose of causing harm to the
plaintiff.  To do something maliciously means to desire to harm a
person or to see a person suffer harm.  To do something
sadistically means to inflict pain on the person for one's own
pleasure.
The United States Constitution protects persons from
being subjected to excessive force.  Prison officials may not act
with deliberate indifference to the safety of prisoners.
. . .
To prevail in this claim, plaintiff must prove that
those defendants were actually in the RHU and that they saw
excessive force being applied against the plaintiff maliciously
and sadistically for the very purpose of causing plaintiff harm
and that they were in a position to stop it, but that they did
not.

App. at 271-73 (emphasis supplied).

Contrary to the position espoused by appellants, the jury instruction adequately insulated appellants from liability if the jury concluded that they used excessive force, even if it is later determined to have been unnecessary. If "force was applied in a good faith effort to maintain or restore discipline," App. at 272 (emphasis supplied), the jury presumably would conclude that although the use of force was excessive, it was still justified given the circumstances. Further, the jury was instructed that it could believe a version of the events other than that presented by Douglas or appellants -- a version whereby appellants used force against Douglas, but it was not excessive, or that it was excessive, but nonetheless appeared justified under the circumstances. App. at 268. A jury verdict that force was justifiably used against Douglas and such force as was used was reasonable under the circumstances was not in accord with the contentions of any of the parties to this litigation, but the jury could reasonably come to such a conclusion by accepting some of the evidence offered by each party.

A party is entitled to a jury instruction that accurately and fairly sets forth the current status of the law. See McPhee v. Reichel, 461 F.2d 947, 950 (3d Cir. 1972) ("It is the responsibility of the trial judge to provide the jury with a clear and accurate statement of the law . . . ."); Resolution Trust Corp. v. Eason, 17 F.3d 1126, 1132 (8th Cir. 1994) (as long as entire charge fairly and adequately contains law applicable to case, judgment will not be disturbed on appeal); Harrison v. Otis

Elevator Co., 935 F.2d 714, 717 (5th Cir. 1991) (trial court has broad discretion to compose jury instructions, as long as they are fundamentally accurate and not misleading).  No litigant has a right to a jury instruction of its choice, or precisely in the manner and words of its own preference.  See Heller Int'l Corp. v. Sharp, 974 F.2d 850, 860 (7th Cir. 1992) (district court has substantial discretion with respect to specific wording of jury instructions and need not give proposed instruction if essential points are covered by those that are given); Anderson v. Branen, 17 F.3d 552, 559-60 (2d Cir. 1994) (litigant is entitled to instruction that correctly reflects applicable law and sufficiently covers essential issues, but party is not entitled to prescribe exact language of that charge).  We conclude that the district court did not abuse its discretion in rejecting the proposed jury instruction offered by appellants.  The charge of the district court was proper and adequate under the facts of this case.

### C.  Special Verdict

The judge presented the jury with special verdict questions to decide the liability issues at the time of trial. The first question asked whether certain prison guards, including appellant Griffith, "used force" against Douglas.  App. at 310. The second question asked whether certain prison guards (other than Griffith) "approved of the use of force" against Douglas. App. at 311 (emphasis added).

During the course of jury deliberations, the jury sent a note to the judge asking if they could move Griffith from question one to question two -- that is, the jurors wished to consider whether Griffith had "approved of the use of force" rather than consider if Griffith had actually himself "used force."  Apparently, the jurors did not think that Griffith himself had used force, but rather they believed that he had tacitly approved the use of force by failing to stop the other prison guards who were actually using improper or unreasonable force.  The district court held that it would be proper for the jury to modify the special verdict form and decide whether Griffith was liable for being present during the assault and failing to intervene.

Appellant Griffith argues that the questions submitted to the jury were special verdict questions, and thus Rule 49(a) of the Federal Rules of Civil Procedure should be applied in reviewing the propriety of allowing the jury to modify the special verdict questions.[14]  He maintains that when special

---

[14].  Rule 49(a) of the Federal Rules of Civil Procedure states in relevant part:

> The court shall give to the jury such explanation and instruction concerning the matter thus submitted as may be necessary to enable the jury to make its findings upon each issue.  If in so doing the court omits any issue of fact raised by the pleadings or by the evidence, each party waives the right to a trial by jury of the issue so omitted unless before the jury retires the party demands its submission to the jury.  As to an issue omitted without such demand the court may make a finding; or, if it fails to do so,

verdict questions are submitted, if "the court omits any issue of fact raised by the pleadings or by the evidence, each party waives the right to a trial by jury of the issue so omitted unless before the jury retires the party demands its submission to the jury." Fed. R. Civ. P. 49(a). Griffith contends that Douglas waived any right to recover against him on a claim of "approving of the use of force" because Douglas failed to object when Griffith's name was not included on question two of the special verdict form at the time it was submitted to the jury.

Douglas argues that Griffith errs in characterizing the claim before the jury as "using force." Douglas interprets the claim more broadly and construes it generally as "excessive force in violation of his Eighth Amendment rights." Appellee's Brief at 16. In this way, Douglas maintains that "using force" or "approving the use of force" were both properly before the jury since it is just as much a violation of Douglas' constitutional rights for Griffith to observe and approve his beating as it is for Griffith to physically beat Douglas. Additionally, Douglas contends that the court did not omit any issue of fact or evidence in submitting the special verdict questions to the jury, because the issue was in evidence by virtue of Douglas' testimony during cross-examination.[15]

(..continued)

> it shall be deemed to have made a finding in accord with the judgment on the special verdict.

Fed. R. Civ. P. 49(a) (1994) (emphasis added).

[15]. See infra note 16.

The approaches adopted by both parties are flawed and fail to address a more fundamental concern -- that is, Griffith was never on notice of any claim that he failed to intervene while others improperly used force against Douglas. Admittedly, during the course of cross-examination, Douglas himself suggested to the jury that Griffith either actually beat him or was present during the beatings, and approved the use of force against him.[16] However, although testimony elicited from Douglas during cross-examination may have indicated to the jury that Griffith was present, but did not participate in the unauthorized use of force, it appears that Douglas never: (1) included this theory in his pleadings; (2) advanced this theory to the jury while presenting his case-in-chief; (3) argued this theory to the jury in his closing arguments; or (4) asked that this alternative theory of liability be included in the special verdict questions.

---

[16]. The cross-examination of Douglas proceeded as follows:

> Q.   You are saying for sure Officer Ardabell, Enriquez, Simoncini and Griffith all beat you; is that correct?
>
> A.   Officer Griffith, he was there. I don't recall him striking any blows. But without a doubt, Officer Enriquez, Ardabell and Simoncini were -- definitely struck me.
>
> Q.   So Sergeant Griffith then didn't hit you. So you are changing your story now; is that correct?
>
> A.   I believe that he hit -- he struck me. But it happened so fast, there were barrages of punches and kicks, some of which I wasn't able to see at the time. But I am inclined to believe he struck me.

App. at 69-70.

The more reasoned and principled approach is to construe the jury question and the colloquy which ensued as an attempt by Douglas to modify the pleadings to conform to the evidence. We believe that Rule 15(b) of the Federal Rules of Civil Procedure contemplates exactly such a situation where a plaintiff attempts to have a claim presented to the jury for consideration even though that claim was not present in the pleadings.[17] See Fed. R. Civ. P. 15(b).[18]

After the jury sent back a question asking if it could move Griffith from question one to question two on the special verdict sheet, Griffith argued vehemently that this was a new

---

[17]. Here, however, in a highly unusual situation, it was not the plaintiff, but rather the jury who implicitly wanted this claim to be added to the complaint. Nonetheless, once raised by the jury, Douglas essentially argued that the pleadings should be amended to conform to the evidence at trial.

[18]. Rule 15(b) of the Federal Rules of Civil Procedure states:

When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

Fed. R. Civ. P. 15(b).

claim never before presented at trial.[19]  Despite the lack of a

---

[19]. The discussion of the jury question proceeded as follows:

Ms. Stoner:  The plaintiff's claim was always [- -] in his complaint, in everything he ever presented [- -] that Griffith participated in the beating.

. . .

Ms. Stoner:  [P]laintiff's claim was always that Captain Griffith beat him.  It was never that he watched.  Therefore, this is a new claim that has been raised against Griffith.  It was never raised in any complaint or any pleading in this action.

The Court:  That is what I am going to do.  If I don't let them do it and I find that I am wrong, I have got a new trial facing me.  If I let them do it and I find that I am wrong, I can in post-trial motions correct the problem.  I think that is the only choice I have until we have enough time to research it.

. . .

Ms. Stoner:  [M]y objection is as stated, it is a new claim against Captain Griffith never raised before.

. . .

Ms. Stoner:  I guess my question is you have now permitted another claim against Captain Griffith.  They have a finding.  I just don't understand how that works.  How could we ever raise a question about that and get judgment NOV?

The Court:  By saying that if I have permitted another claim and it is wrong, if I am legally wrong in this, it would appear to me you could get judgment NOV.

. . .

The Court:  I have the complaint here.  But my concern is that the jury could very easily determine maybe from the evidence that he didn't beat anybody, but that he was present and other people did.  I don't know whether that makes it a new claim or it compromises a claim.

App. at 292-95.

formal motion by Douglas to amend the pleadings, the district court effectively permitted Douglas to amend the pleadings and include a claim against Griffith for approving the use of force.

We review for abuse of discretion the district court's granting of leave to amend the complaint.  Berger v. Edgewater Steel Co., 911 F.2d 911, 916 (3d Cir. 1990), cert. denied, 499 U.S. 920, 111 S. Ct. 1310 (1991).

Although the claim that Griffith approved the use of force was not raised in the pleadings, Rule 15(b) permits pleadings to be amended if the claim was tried by the express or implied consent of the parties.  "[I]f the issue . . . has not been tried with the consent of the parties, then an amendment to conform to the pleadings will not be permitted no matter when made.  6A Charles A. Wright et al., Federal Practice and Procedure § 1494, at 53 (1990) (emphasis added).  Clearly, the record does not support a finding of express consent by Griffith.

We must next address whether this issue was tried with the implied consent of Griffith.  As noted by the Court of Appeals for the Fifth Circuit, a finding that an issue was tried by implied consent depends on:

> whether the parties recognized that the
> unpleaded issue entered the case at trial,
> whether the evidence that supports the
> unpleaded issue was introduced at trial
> without objection, and whether a finding of
> trial by consent prejudiced the opposing
> party's opportunity to respond.

Portis v. First Nat'l Bank, 34 F.3d 325, 332 (5th Cir. 1994) (quoting United States v. Shanbaum, 10 F.3d 305, 312–13 (5th Cir.

1994)); see Acequia, Inc. v. Clinton (In re Acequia, Inc.), 34 F.3d 800, 814 (9th Cir. 1994) (plaintiff must show that defendant understood that evidence had been used to prove the new issue and that the new issue had been directly addressed and not inferentially raised by incidental evidence); Yellow Freight Sys. v. Martin, 954 F.2d 353, 358 (6th Cir. 1992) (same).

We observe that not only did Griffith not object to the introduction of the evidence as to the claim of approving the use of force, but it was Griffith who opened the door to this evidence while cross-examining Douglas. Nevertheless, an issue has not been tried by implied consent if evidence relevant to the new claim is also relevant to the claim originally pled, because the defendant does not have any notice that the implied claim was being tried. Gamma-10 Plastics v. American President Lines, 32 F.3d 1244, 1256 (8th Cir. 1994), cert. denied, __ U.S. __, __ S. Ct. __, 63 U.S.L.W. 3641 (Feb. 27, 1995) (No. 94-1188); see Portis, 34 F.3d at 332 (if evidence of a pleaded issue and an unpleaded issue overlaps, there is no implied consent absent a clear indication that the party using the evidence is attempting to raise a new issue); Acequia, 34 F.2d at 814 (same); Yellow Freight, 954 F.2d at 358 (evidence that is relevant to a pleaded issue as well as an unpleaded issue does not give fair notice to the opposing party that the unpleaded issue is entering the case).

Although the testimony elicited from Douglas arguably was evidence relevant to whether Griffith approved the use of force, the testimony was also relevant to whether Griffith

actually used force.  Douglas' uncertainty as to whether Griffith used force against him pointed to the weakness in Douglas' pleaded claim (that Griffith actually used force).  Regardless of who introduced the evidence at trial, Douglas bore the burden of notifying defense counsel that he intended to use this evidence to prove an additional claim.  Because Griffith was not on notice that Douglas wished to argue an additional claim at trial, Griffith cannot be said to have impliedly consented to an amendment of the pleadings.[20]  Finally, it is obvious that Griffith was severely prejudiced at such a late stage in the proceedings when the district court effectively permitted Douglas to amend the pleadings and allowed the jury to consider another theory of liability against Griffith without Griffith having had the opportunity to defend against this new claim.

Because Douglas failed to assert his claim in a timely manner and this failure prejudiced Griffith, judgment as a matter of law must be granted against Douglas and in favor of Griffith on the belated claim that Griffith "approved of the use of force."[21]

---

[20].  It is contrary to the record for Douglas to even suggest that he was attempting to prove this additional claim at trial. As mentioned previously, it appears that Douglas never: (1) advanced this theory to the jury while presenting his case-in-chief; (2) argued this theory after the evidence was elicited during cross-examination; (3) argued this theory to the jury in his closing arguments; or (4) asked that this alternative theory of liability be included in the special verdict questions.  In fact, we are confident that had the jury never sent a question to the court, this additional theory of liability would never have been pursued by Douglas.

[21].  The only claim properly asserted at trial and preserved for jury consideration against Griffith is that he personally used

                        III. Conclusion

        We will reverse the judgment of the district court and
remand for a new trial because the district court abused its
discretion by improperly limiting the scope of cross-examination
of a key witness for the plaintiff.  We affirm the ruling of the
district court which rejected the appellant's proposed jury
charge.  The charge of the district court adequately set forth
the law governing the appropriate use of force against prisoners.
Finally, as to the special verdict issue, we conclude that the
district court erred in allowing the jury to render a verdict
finding appellant Griffith liable for approving the use of
excessive force, when the only theory of liability tried before
the court and submitted to the jury was that Griffith actually
participated in an improper beating.  We will direct the district
court to enter judgment in favor of Griffith on the claim against
him.


(..continued)
excessive force against Douglas.  As to that claim, the district
court concluded that, "[t]he testimony admittedly does not
support the allegation that defendant Griffith actually beat
Plaintiff."  Douglas v. Owens, No. 89-1879, slip op. at 2.  We
agree that judgment as a matter of law was properly granted
against Douglas and in favor of Griffith on Douglas' claim that
Griffith used excessive force against him.  Although we have
earlier concluded that a new trial is warranted due to the
improper limitation on the scope of cross-examination, appellant
Griffith will be dismissed, since the jury did not return a
verdict against him on the only theory of liability that was
properly presented for its consideration.  Douglas may proceed
with a new trial against Simoncini, Enriquez, and Ardabell.

Douglas v. Owens, No. 94-7406


NYGAARD, Circuit Judge, dissenting.


I believe the issue in this case is very close. Nonetheless, I dissent because I would, in cases such as this, give greater deference to the discretion exercised by the district court, than appellant would have us give. To do otherwise further obscures the already-blurred line demarcating the boundary between the plenary and abuse of discretion standards of review. I consider reversing the district court's decision here to be the antithesis of the holding the majority cites that:

> [t]rial judges retain wide latitude to impose
> reasonable limits on cross-examination based
> on concerns about, among other things,
> confusion of the issues or interrogation that
> is repetitive or only marginally relevant.

United States v. Baptista-Rodriguez, 17 F.3d 1354, 1370-71 (11th Cir. 1994). I conclude that the trial judge acted within her sound discretion, and would affirm.

What the appellant invites us to perform here is essentially a plenary review of a discretionary decision that simply cannot and, moreover, should not be reviewed de novo. The myriad of twists and turns in a trial, the shifting biases as evidence comes before the factfinder, and the entire personality and flavor of a trial cannot be adequately conveyed in the cold record we review on appeal. Hence, we have standardized review

to grant the district courts "wide latitude" to limit cross-examination, and to make numerous other evidentiary decisions, subject only to a review for whether they abused that discretion. Not from any argument given us by the appellant, nor by any definition of the word, can I consider "abuse" an appropriate label for the district court's discretion on this singular judgment call.

At sidebar, appellant's counsel argued to the district court that she be permitted to reveal to the jury that "[Sabir] was terminated by the department. ..." That is precisely what the court allowed her to do.[22] In her argument to the district court, counsel mentioned, without citing any source of proof, that "[Sabir] was terminated" for "alleged involvement with the rioting inmates." Nonetheless, she did not persist on this point, and I deduce from the substance of the sidebar that the real argument was whether the word "fired" or "terminated" more accurately describes how Sabir was separated from the chaplaincy. (See Maj. typescript at 6, n.4). Moreover, I consider the subtle differences between the use of the word "terminated" and the use of the word "fired" to be the type of evidentiary "fine tuning" that is unbecoming when done by appellate judges, who review the evidence in a vacuum relieved only by a printed record. Either

---

[22]. The attorneys had earlier agreed that plaintiff's counsel would not elicit from a correction officer/witness the reason why she was discharged because they considered this evidence to be irrelevant.

word implies that he did not leave voluntarily. I reject appellant's argument on this issue.

Next, even if I were to conclude that this decision by the district court was an abuse of its discretion, I believe the error is harmless. Indeed, the testimony the Imam offered, even when taken in the light most favorable to appellee, is the following:

1. that the plaintiff was "in a shameful manner," A73;

2. that Douglas "said he was being harassed by the officers," A74;

3. that Douglas was naked in his cell and "had abrasions or bruises in the chest area and around the neck area," and "was sick with a cold," A74-75;

4. that Lieutenant Spells "said to me that the atmosphere, that there was nothing he could really do in reference to getting medication because of the atmosphere in the prison ... his hands was [sic] tied. And even if he wanted to do something, he couldn't do it," A76-77;

5. the testimony most damaging to the defendants was Sabir's nonresponsive conclusion that the bruises "signalled to me that he had been beaten." To this appellant objected, but then did not even follow with a request that the Imam's statement be stricken.

The gravamen of Douglas' complaint is that a number of correctional officer defendants "did in fact, acting under the color and authority of Pennsylvania state law, beat, stumped [sic] and kicked plaintiff Andre Douglas in the head, arms, back and legs while plaintiff was handcuffed and naked," and that other officers during this beating "did not make an attempt to stop them." A20-21. Hence, what is at issue is whether some defendants beat Douglas, while others stood idly by. The defendants flatly denied the allegations. On that point, when asked if he saw "any of these defendants assault Mr. Douglas," Sabir answered, "No, I can honestly say no." A80.

Finally, defendants' reason for wanting this line of inquiry before the jury was ostensibly to discredit the witness by attempting to show bias. This argument also fails. A significant point we recognize, as the district court no doubt did, but which the appellant conveniently elides, is that Sabir was not terminated by the defendants. Indeed, they were co-employees of the same facility. Nor was it shown, offered or even suggested that Sabir harbored some bias towards the defendants -- if indeed he harbored any at all. In sum, the whole line of inquiry was simply irrelevant to what was at issue in the trial.

I conclude that the district court committed no reversible error. The most critical testimony Sabir offered was that plaintiff was beaten; and this, although nonresponsive and

improper, was not requested to be stricken.  Whether the witness was biased against his former employer is not relevant to these defendants and whether the jury believed Sabir's testimony is not relevant to the issue of who beat Douglas.  On that critical point, Sabir's testimony was as favorable to the defendants as to the plaintiff.  Finally, as the district court concluded, and with which I concur, permitting the defense to explore the reasons only "alleged" for Sabir's termination, and then the plaintiff to engage in the rehabilitative explanations which were destined to follow, was likely to create the distracting "trial within a trial" which tends to confuse jurors, obfuscate the real issues, and which courts laudably seek to prevent.  I find no abuse in the court's discretionary decisions.  I would affirm.